**Michael P. CALLICRATE, an individual, Plaintiff,**

v.

**WADSWORTH MANUFACTURING, INC., a Montana corporation, and Custom Cowboy Creations, a sole proprietorship, Defendants.**

**No. CV 00–185–M–DWM.**

United States District Court,
D. Montana,
Missoula Division.

Aug. 27, 2002.

Michael J. Milodragovich, Elizabeth A. O'Halloran, Milodragovich Dale Steinbrenner & Binney, Missoula, MT, Joseph E. Kovarik, Benjamin B. Lieb, Sheridan Ross, Attorney at Law, Denver, CO, for plaintiff.

James W. Bain, Brega & Winters, Denver, CO, W. Dennis Starkel, Robert C. Lukes, Garlington, Lohn & Robinson, PLLP, Missoula, MT, Keith S Bergman, Attorney at Law, Spokane, WA, for defendants.

## ORDER

MOLLOY, Chief Judge.

A *Markman* hearing was held in this case on December 22, 2001. After considering the briefs and documentation submitted by the parties and the arguments at the hearing, the Court enters the following Order.

### I. Introduction

This case involves the alleged infringement of patents on three castration tools. Plaintiff Michael Callicrate filed suit alleging that Defendants Wadsworth Manufacturing and Custom Cowboy Creations (collectively Wadsworth or Defendant) infringed on two patents held by Callicrate, Numbers 5,681,329 (the '329 Patent) and 5,997,553 (the '553 Patent), when Wadsworth manufactured and marketed second and subsequent generations of its EZE castration tools. Wadsworth's original EZE castration tool was itself the subject of Patent number 4,691,704 (the '704 Patent). Wadsworth denies infringement and counterclaims that the '329 and '553 Patents are invalid because the castration tools that are the subjects of those patents infringe upon the earlier issued '704 Patent.

### II. Factual Background

On September 8, 1987, Wadsworth was issued the '704 Patent for its original castration tool. The original tool is a caulking gun-type mechanism that uses a length of surgical tubing to loop around an animal's testicles near where the scrotal pouch meets the body. The tubing is tightened and secured in a loop using a metal ring, or grommet. If done correctly, the tubing cuts off the blood flow to the animal's testicles and the testicles fall off.

Callicrate felt Wadsworth's tool contained flaws that could be improved upon to make it easier to use. Callicrate felt the caulking gun-type mechanism did not always allow for adequate tension of the surgical tubing. Also, the tool did not always allow for adequate crimping pressure on the grommet meaning the ligation material could fall off before castration was complete. Wadsworth claims these are not flaws in the original tool itself, but are the result of improper use.

Callicrate's original tool [1], which is the subject of the '553 Patent, contains two key differences from Wadsworth's tool.

1. Callicrate claims its tool is a ligation tool that can be used for purposes other than castration while the '704 Patent limits Wadsworth's tool to castration.

First, Callicrate's tool has a spool that allows the ligation material to be wound through the grommet and around the spool providing "infinite tightening of the ligation material." Second, Callicrate's tool uses a lever system to crimp the grommet around the ligation material with less effort, but greater force. Callicrate claims these differences solved the tightening and inadequate crimping problems of Wadsworth's tool. Wadsworth subsequently redesigned its tool adding a lever system similar to Callicrate's.

Callicrate next began marketing a "preformed endless loop of ligation material." To accommodate the preformed loops, Callicrate modified his tool. The modified tool is the subject of the '329 Patent. After Callicrate introduced his endless loop tool, Wadsworth also began marketing its own endless loops and a tool to accommodate them.

### III. The Claims

Callicrate claims Wadsworth's redesigns of its EZE castration tool to include a crimping lever infringes on Claims 11, 12, 13, 16, and 18 of the '553 Patent. Callicrate also claims Wadsworth's redesigns of its EZE castration tool to accommodate endless loops infringes on Claims 7, 11, 18, 19, 20, 25, 27 and 30 of the '329 Patent.

Wadsworth denies infringement and counterclaims that the '553 and '329 Patents are invalid because both of Callicrate's tools infringe on Claim 6 of the '704 Patent.

### IV. Applicable Law

■ Patent infringement is determined through a two step process. First, the court · must interpret the claims. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995). Next is a factual determination as to whether the accused device infringes on the claim. When interpreting a claim, the court looks first to intrinsic evidence, which is made up of the claims themselves, the specifica-

tion, and the prosecution history. *Pitney Bowes, Inc. v. Hewlett–Packard Company,* 182 F.3d 1298, 1309 (Fed.Cir.1999).

■ Terms in a claim are to be given their ordinary and accustomed meaning, unless the party advocating an alternate meaning can demonstrate the alteration is required through clarity, deliberateness, and persuasion. *K–2 Corporation v. Salomon S.A.,* 191 F.3d 1356, 1362 (Fed.Cir. 1999). If the claim language is clear on its face, intrinsic evidence is considered only to determine whether a deviation from the clear language is required. *Id.* In construing a claim, the court cannot read additional limitations into the claim from the specifications. If the means-plus-function language of 35 U.S.C. § 112, ¶ 6 is implicated, the claim can be limited to the functions set forth in the specification.

■ A means-plus-function limitation recites a function to be performed rather than a definite structure. *Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.,* 145 F.3d 1303, 1308 (Fed.Cir. 1998). If the means-plus-function language is implicated, the court must identify the function and import limitations from the specification. The limitation is construed to cover corresponding structure, material, or acts described in the specification and equivalents. Elaborations on the structure that are unrelated to the particular function are not considered to correspond to the recited function. *Id.*

### V. Analysis

#### A. The '704 Patent

The parties agree Claim 6 of the '704 Patent is the only Claim Callicrate has allegedly infringed upon. Claim 6 is set forth as follows, with the allegedly ambiguous portions in bold:

6. **A process for the castration of larger animals by means of endless**

elastic ligation material, comprising, in combination:

the formation of ligation material in a loop forwardly of a crimpable grommet adapted to fasten the ends of the ligation material together upon crimping, said grommet being carried in a tool having means of moving at least one end of the ligation material rearwardly through the grommet on the side opposite the loop and having second means of crimping the grommet when in fastening position;

manually passing the ligation material over the scrotal pouch and contents of an animal to be castrated;

tightening the ligation material about the scrotal pouch of said animal at a position approximately at the point of contact of the scrotal pouch with the body structure;

crimping the grommet upon the ligation material to fasten the ends together;

removing the tool from the fastened ligation material and trimming the ends thereof adjacent the grommet.

The disputed passage will be separated into five phrases for analysis.

**1. "A process for the castration of larger animal by means of endless elastic ligation material, comprising, in combination"**

█ Callicrate urges the Court to interpret "endless elastic ligation material" to mean linear length of bulk ligation material. Callicrate argues the language used by Wadsworth, which constitutes the preamble of Claim 6, limits the claim "to methods of castration which use linear lengths of bulk ligation material."

Wadsworth proposes that "endless ligation material" should be interpreted to mean a tensed length of ligation material with its ends fastened together to cause ligation of an animal body part. Wads-

worth argues the preamble states the intended use of the tool, but does not serve as a limitation because the language of Claim 6 itself is clear. Wadsworth further argues use of the term "endless" was meant to distinguish its invention from previous tools that required stretching the ligation material before looping it over the scrotal pouch.

█ The preamble of a claim does not limit the claim's scope when the body of the claim sets forth the complete invention, including all limitations, and the preamble does not offer a distinct definition of any limitations. *Pitney Bowes Inc. v. Hewlett–Packard Company*, 182 F.3d 1298, 1305 (Fed.Cir.1999). If, however, the preamble when read in context of the entire claim states a limitation or is necessary to sustain the claim, the preamble will be construed as part of the claim. *Id.*

In *Pitney Bowes*, disputed claims contained the following preambles:

1. A method of producing on a photoreceptor an image generated of shapes made up of spots, comprising: directing a plurality of beams of light towards a photoreceptor, each beam of light generating a spot on the photoreceptor and controlling a parameter of the light beams to produce spots of different sizes whereby the appearance of smoothed edges are given to the generated shapes.

3. Apparatus for producing on a photoreceptor an image of generated shapes made up of spots, comprising: means for directing a plurality of beams of light toward a photoreceptor to generating [sic] a plurality of spots on the photoreceptor and means for generating spots of different sizes whereby the appearance of smoothed edges are given to the generated shapes.

*Id.* at 1302. The Federal Circuit found the preamble to be "necessary to give life, meaning and vitality to the claim." *Id.* at

1305 (internal quotations omitted). The Federal Circuit reasoned that the preamble language was "intimately meshed with the ensuing language in the claim" and was not simply a description of the invention's intended use. *Id.* at 1306. The Federal Circuit pointed to the terms "generated shapes" and "spots" in the body of the claims and found they could be understood only by referring to the preamble statement.

Wadsworth's preamble to Claim 6 is similar to that in *Pitney Bowes.* Wadsworth initially uses the phrase "ligation material" as part of the larger phrase "endless elastic ligation material," which describes the type of ligation material to be used in Wadsworth's patent. Throughout the remainder of Claim 6, however, only "ligation material" is used. It is necessary to refer to the preamble of Claim 6 to determine what is meant by "ligation material." Therefore, the preamble is not merely a description of the intended use of the invention, but a part of the claim that is necessary to give it meaning.

In this light, Callicrate's proposed interpretation is the better one. Callicrate's interpretation limits the ligation material to linear lengths of material. Wadsworth's proposed interpretation reads the entirety of Claim 6 into the phrase "ligation material."

**2. "the formation of ligation material in a loop forwardly of a crimpable grommet adapted to fasten the ends of the ligation material together upon crimping"**

 Callicrate's proposed interpretation for this phrase is

forming the loop during the process of placing a linear length of bulk ligation material into the tool and where the two ends of the looped linear length of ligation material are free after passage through a crimpable grommet for securing to a tightening structure.

Wadsworth proposes interpreting the language as "forming a loop in a length of ligation material forwardly of a grommet."

Callicrate argues formation of ligation material in a loop means the loop is formed while placing a linear length of ligation material into the tool and that the two ends of the looped linear length of ligation material must be free after passing through the grommet for securing to a tightening structure. Much of Callicrate's argument is based on requirements set forth in the specification.

Wadsworth counters that the language of the claim itself is clear and does not require analyzing the specification. Wadsworth argues the phrase requires only that material be formed in a loop ahead of a grommet that will fasten the ends together. According to Wadsworth, the language does not set forth when the loop needs to be formed or how the ends need to come out.

Wadsworth's argument on this point is strained. First, the language is not as clear as Wadsworth asserts. Without clear language, it is necessary to review the specification, which confirms Callicrate's proposed interpretation. Even if the language is clear, however, that the ends of the ligation material end up behind the grommet is implied. If the ligation material is passed through the grommet and the loop is in front of the grommet, it follows that the ends of the ligation material forming the loop will be behind the grommet.

**3. "said grommet being carried in a tool having means of moving at least one end of the ligation material rearwardly through the grommet on the side opposite the loop"**

 Callicrate argues that use of the word "means" in this phrase invokes 35 U.S.C. § 112, ¶ 6 and limits the scope of the function disclosed to the "structure(s)

described in [the] patent's specification for performing the claimed function and structural equivalents." Callicrate maintains the only structure in the '704 Patent for moving the ligation material rearwardly is the caulking gun-type device with an attached tightening plate and rod. Thus, Callicrate argues "means of moving ... ligation material rearwardly" must be interpreted to mean "a retracting plate and rod attached to a caulking gun-type actuating device and equivalents." Callicrate further argues that his winding spool method is not an equivalent structure to the caulking gun-style device because the Patent Trade Office considered the '704 Patent during the prosecution of the '553 and '329 Patents and found the winding means was not a part of the '704 Patent.

Wadsworth counters that the language does not limit the method of moving the ligation material rearwardly to the caulking gun-type structure. Wadsworth also maintains that Callicrate's fish reel-type structure is one of the means covered by the '704 Patent.

Use of the word "means" raises the presumption that Wadsworth intended to invoke 35 U.S.C. § 112, ¶ 6. While Wadsworth claims this is not the case, he does not offer any legal support for his conclusion. If the means-plus-function language is invoked, the means of moving the ligation material rearwardly through the grommet is confined to the structure or structures set forth in the specification and equivalents. *Chiuminatta,* 145 F.3d at 1308. The only structure disclosed by Wadsworth is the caulking gun-style structure. Therefore, the performance of the function specified in the third phrase is limited to the caulking gun-style device. Whether Callicrate's windable spool device is an equivalent, however, is a question of fact and is not determined at this stage. *Bai. v. L & L Wings, Inc.,* 160 F.3d 1350, 1353 (Fed.Cir.1998) ("determination of in-

fringement, whether literal or under the doctrine of equivalents, is a question of fact").

**4. "having second means of crimping the grommet when in fastening position"**

 Callicrate argues that "means of crimping the grommet" invokes 35 U.S.C. § 112, ¶ 6 and must be interpreted to include only the handle/rod/dog mechanism disclosed in the specification. Callicrate contends that its crimping lever is not equivalent to Wadsworth's device. Wadsworth counters that the means of crimping are not limited to the particular crimping structure disclosed in the '704 Patent and that Callicrate's lever device is covered by this language.

Again, use of the word "mean" raises the presumption that Wadsworth was implicating the means-plus-function language of 35 U.S.C. § 112, ¶ 6. Wadsworth again argues that the statutory presumption does not apply, but offers no legal support for the assertion. Wadsworth also asserts that the phrase should be analyzed under the doctrine of equivalents rather than 35 U.S.C. § 112, ¶ 6. However, the doctrine of equivalents is a test for infringement, not claim interpretation. *Chiuminatta,* 145 F.3d at 1310–11. Wadsworth has failed to establish that the statutory presumption should not apply. Therefore, the means for crimping the grommet is limited to the handle/rod/dog mechanism disclosed in the specification and any equivalents. Whether Callicrate's lever mechanism is an equivalent is a question of fact. *Bai,* 160 F.3d at 1353.

**5. "removing the tool from the fastened ligation material and trimming the ends thereof adjacent the grommet"**

 Callicrate contends this phrase should be interpreted to require sequential steps. Thus, the tool is removed and then the ends of the ligation material are

trimmed. Wadsworth counters that the claim language does not require a particular order and, therefore, the steps may be performed in any order.

■ Generally, absent a specific requirement that steps of a method be performed in order, the steps will not be construed to require one. *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1342 (Fed.Cir.2001). However, the steps of a method may implicitly require that they be performed in the order written. *Id.* citing, *Loral Fairchild Corp. v. Sony Corp.*, 181 F.3d 1313, 1322 (Fed. Cir.1999).

In this case, the method implicitly requires that certain steps be performed in order. However, removal of the tool and cutting the ligation material may be performed in either order. Claim 6 describes a process for castrating animals. Performance of each step requires that the preceding step be completed. For example, the ligation material cannot be tightened until it has been passed over the scrotal pouch. Likewise, the grommet cannot be crimped on the ligation material until the ligation material has been fully tightened. However, the language for removing the tool and cutting the ligation material is contained within one step. There is no indication in the claim language itself that removal and cutting must be performed in the order written, other than that the implicit requirement that the steps as a whole be performed in order.

However, allowing removal and cutting to be performed in either order is supported by language in the specification. In the preferred embodiment, Wadsworth describes the use of the tool and states

> [o]nce the tool is removed, the ends of the ligature material may be trimmed immediately adjacent the grommet fastening the structure or, if desired, those ends may be cut immediately rearwardly of inner forward plate 37 before remov-

ing the tool to make the removal process simpler.

In light of the language in the preferred embodiment and that removal and cutting are steps within steps, rather than separate steps, the claim allows the actions to be performed in either order.

### 6. Conclusion

According to the analysis above, the language of Claim 6 is interpreted as follows:

(1) "The formation of ligation material in a loop forwardly of a crimpable grommet" means forming a loop of ligation material during the process of placing a linear length of bulk ligation material into the tool forward of a grommet;

(2) "A tool having means of moving at least one end of the ligation material rearwardly" means a caulking gun-type device attached to a pulling rod;

(3) "Having second means of crimping the grommet when in fastening position" means elongated crimping rods rotatably mounted within elongated tubes attached to the side of the castration tool, the crimping rods being fastened to crimping handles at one end and crimping dogs at an opposite end; and

(4) "Removing the tool from the fastened ligation material and trimming the ends thereof adjacent the grommet" means removing the tool and trimming the ends or trimming the ends and removing the tool.

### B. The '553 Patent

The '553 Patent is Callicrate's initial castration tool. The claims at issue are set forth as follows, with the disputed parts in bold:

11. A tool for litigating a body part, comprising:

an elongate tool body having a forward end and a rearward end, said rear-

ward end having a handle and said forward end having a means for receiving elastomeric ligature material:

**means for pulling said ligature material towards said rearward end** of said tool body, said means for pulling interconnected to said tool body; and

**a lever pivotally mounted on said tool body for deforming a grommet** positioned in said means for receiving.

12. The tool of claim 11, further comprising:

**cutting means for cutting elastomeric ligature material,** said cutting means operatively attached to said tool.

16. The tool as set forth in claim 11 wherein said **means for pulling comprises a caulking gun-typ device.**

18. A tool for ligating a body part, comprising:

an elongated tool body having a forward end and a rearward end, said rearward end having a handle and said forward end having a means for receiving elastomeric ligature material;

**means for pulling said ligature material towards said rearward end** of said tool body, said means for pulling interconnected to said tool body; and

**a lever pivotally mounted on said tool body for deforming a grommet** positioned in said means for receiving; and

**cutting means for cutting elastomeric ligature material,** said cutting means operatively attached to said tool.

The disputes relevant to the '553 Patent can be divided into three areas: (1) the means for pulling, (2) the grommet deforming lever, and (3) the means for cutting.

### 1. Means for pulling

■ Callicrate contends "means for pulling" in the '553 Patent is expressed in means-plus-function language and under 35 U.S.C. § 112, ¶ 6 is limited to the struc-

tures disclosed in the specification. Callicrate maintains the windable spool mechanism and the caulking gun-style device used by Wadsworth were disclosed in the specification, allowing means for pulling in the '553 Patent to cover the windable spool device, the caulking gun-type device, and other equivalents.

Wadsworth does not argue that 35 U.S.C. § 112, ¶ 6 is inapplicable and concedes the winding spool device and the caulking gun-style device are disclosed in the '553 Patent's specification. Wadsworth argues that language in the '553 Patent's specification related to the caulking gun-style device infringes upon the '704 Patent.

Because Wadsworth concedes the point and does not present any other argument, there is not an issue to be resolved relative to the means for pulling language. Whether the '553 Patent infringes upon the '704 Patent is an issue of fact to be determined later. *Bai,* 160 F.3d at 1353.

### 2. Grommet deforming lever

■ Callicrate argues "grommet deforming lever" must be narrowly defined to include only the type of lever disclosed in the '553 Patent's preferred embodiment. Callicrate contends Wadsworth is attempting to define the phrase so broadly that there will be no limit to the types of structures that will fit the definition. Wadsworth counters that "grommet deforming lever" must be construed according to its ordinary meaning. Wadsworth argues that the '553 Patent and the '704 Patent each disclose a lever-type device, the preferred embodiment set forth in each Patent's specification is one of many forms the lever device can take, and the "grommet deforming lever" in the '704 and '553 Patents read on each other.

The claims is the·'553 Patent make specific reference to a lever-type crimping device. Further, the specification and the

preferred embodiment speak of a "lever pivotally mounted on the body of the tool." Contrarily, the '704 Patent does not speak of a lever and the specification discloses a crimping rod-dog mechanism. Wadsworth advocates for a broad reading of lever, presumably so it can argue that Callicrate's lever mechanism infringes on the '704 Patent. However, such a broad reading is not supported by the evidence before the Court, and Wadsworth does not point to any legal or factual basis for its argument.

### 3. Means for cutting

 Callicrate argues that means for cutting is limited to the methods disclosed in the specification and equivalents. Wadsworth advocates a broad interpretation that would include any cutting device connected to the tool.

Use of the word "means" raises the presumption that Wadsworth intended to invoke 35 U.S.C. § 112, ¶ 6 and confine the method for cutting to those structures set forth in the specification. *Chiuminatta*, 145 F.3d at 1308. The specification discloses a method for cutting using a device that is pivotally mounted to the tool. Wadsworth has not presented evidence sufficient to overcome the presumption. Therefore, the means for cutting is limited to those methods set for the in the specification and any equivalents.

### 4. Conclusion

According to the analysis above, the language of the '553 Patent is interpreted as follows:

(1) "Means for pulling" means a winding spool or caulking gun-type tightening mechanism;

(2) The lever mechanism is a lever pivotally mounted to a ligation tool body such that the lever pivots about a fulcrum pin which is substantially perpendicular to the direction in which the preformed endless loop is pulled during the tightening operation; and

(3) "Cutting means for cutting elastomeric ligature material" means any cutting mechanism which is pivotally mounted to a tool body and which will cut ligature material when pivoted into contact with the ligature material.

### C. The '329 Patent

The claims interpretation issues relevant to the '329 Patent are (1)whether "means for pulling" is broad enough to include the caulking gun-type device; (2) whether "means for securing" is broad enough to encompass the '704 Patent's crimping structure; and (3) the meaning of preformed endless loop.

The relevant claims from the '329 Patent are set forth below. The disputed portions are in bold text.

7. A method for ligating an animal body part, comprising:

attaching a **preformed endless loop** of elastomeric material to a ligation tool;

manually passing said loop around a body part of an animal to be ligated;

pulling said loop using said tool to tighten said loop round said body part; and

securing said loop with a grommet so that said loop maintains pressure around said body part of said animal, wherein said step of securing comprises the forming of a grommet around said loop.

11. A system for castrating an animal, comprising:

a **preformed endless loop** of elastomeric ligature material, said endless loop having a forward and a rearward end;

means for receiving said endless loop;

**means for pulling said rearward end of said endless loop,** said pulling means interconnected to said receiving means; and

**means for securing said forward end of said endless loop,** wherein the

forward end of said endless loop is under tension after being secured, said means for securing interconnected with said receiving means.

22. A method for castrating an animal, comprising:

positioning a **preformed endless loop** of elastomeric ligature material into a receiving end of a tool, said endless loop having a forward end, a rearward end, and a grommet attached between said forward end and said rearward end; **attaching said rearward end of said endless loop to a means for pulling said endless loop;**

passing said forward end of said endless loop around the scrotum of an animal;

pulling said rearward end of said endless loop to cause said forward end of said endless loop to constrict around said scrotum of said animal; and

securing said forward end of said endless loop to maintain pressure around said scrotum of said animal.

### 1. Means for pulling

Similar to its argument on the '553 Patent, Callicrate argues "means for pulling" in the '329 Patent is means-plus-function language implicating 35 U.S.C. § 112, ¶ 6. Callicrate contends the windable spool and the caulking gun-style device are both disclosed in the '329 Patent's specification meaning the "means for pulling" language must be interpreted to include both.

Wadsworth admits both structures are disclosed in the '329 Patent, however, it argues "means for pulling" should not be interpreted to include both structures because Claims 11 and 22 are invalid under a doctrine of equivalents analysis. As noted above, however, the doctrine of equivalents applies only when determining infringement and is a question of fact. *Bai*, 160 F.3d at 1353. Because Wadsworth does

not dispute that the means-plus-function language applies and that the windable spool and caulking gun-style devices are disclosed in the specification, Callicrate's interpretation is appropriate.

### 2. Means for securing

■ Callicrate argues "means for securing" implicates 35 U.S.C. § 112, ¶ 6 and is limited to the structure disclosed in the '329 Patent's specification. Callicrate argues that only the lever structure, and not the '704 Patents's grommet crimping structure, is disclosed in the '329 Patent's specification. Wadsworth concedes that Callicrate's interpretation is correct.

### 3. Preformed endless loop

■ Wadsworth argues the phrase "preformed endless loop" in the '329 Patent is "literally inaccurate as the loop to which Callicrate refers has two ends that are joined together and therefore the loop involved with this structure is not literally 'endless.'" Wadsworth argues Callicrate's endless loop must be defined by the description set forth in the '329 Patent's specification and is confined to a loop that is large enough to pass over the animal's scrotal pouch without stretching. Wadsworth distinguishes its own endless loop from Callicrate's, noting that it is truly endless and that it must be stretched before attaching it to the scrotal pouch.

Callicrate counters that Wadsworth is reading ambiguity into the phrase "preformed endless loop" so he can confine the phrase to the language set forth in the '329 Patent's specification. Callicrate further states that the '329 Patent's specification defines "preformed endless loop" as a loop "having either a unitary structure or a loop formed by joining two ends of a linear length of material." Callicrate also argues that Wadsworth's proposed size limitation is unsupportable because the argument is based on language in the specification rather than language in the claim itself.

**1112**

Wadsworth does not offer any support for his argument. The language of the claims in the '329 Patent do not limit the size of the loop, nor do they state that the loop must be circular. Contrarily, the claims in the '329 Patent speak of the preformed endless loop having a "forward end and a rearward end." This language undermines Wadsworth's argument that the loop must be circular.

Wadsworth is attempting to limit the structure of the preformed endless loop to that disclosed in the preferred embodiment. However, Callicrate did not use the term "means" in relation to the preformed endless loop. Therefore, he is not presumed to have invoked the means-plus-function language of 35 U.S.C. § 112, ¶ 6. The language of the Claims is clear and the Court cannot read in limitations from the specification. Therefore, Callicrate's interpretation is the most accurate.

**4. Conclusion**

According to the discussion above, the '329 Patent is interpreted as follows:

(1) "A preformed endless loop" means a loop of ligation material, regardless of size, having either a unitary, circular structure, or formed by joining the ends of a linear length of ligation material.

(2) "Means for pulling" means a winding spool device or the Wadsworth caulking gun-style tightening mechanism.

(3) "Means for securing" means a lever pivotally mounted to a ligation tool body such that the lever pivots about a fulcrum pin which is substantially perpendicular to the direction in which the preformed endless loop is pulled during the tightening operation.

IT IS SO ORDERED.