# United States Court of Appeals for the Federal Circuit

04-1597, -1598

MICHAEL P. CALLICRATE,

Plaintiff-Appellant,

v.

WADSWORTH MANUFACTURING, INC.,

Defendant-Cross Appellant.


Robert R. Brunelli, Sheridan Ross, P.C., of Denver, Colorado, argued for plaintiff-appellant. With him on the brief was Benjamin B. Lieb.

Frank J. Dykas, Dykas, Shaver & Nipper, LLP, of Boise, Idaho, argued for defendant-cross appellant. Of counsel were Derek H. Maughan and Stephen M. Nipper.

Appealed from: United States District Court for the District of Montana

Chief Judge Donald W. Molloy

# United States Court of Appeals for the Federal Circuit

04-1597,-1598

MICHAEL P. CALLICRATE,

Plaintiff-Appellant,

v.

WADSWORTH MANUFACTURING, INC.,

Defendant-Cross Appellant.

———————————————————

DECIDED:  October 31, 2005

———————————————————

Before NEWMAN, RADER, and PROST, Circuit Judges.

RADER, Circuit Judge.

Callicrate is the owner of several patents on methods and apparatuses for castrating large animals (like cattle), including U.S. Patent No. 5,236,434 (the '434 patent); U.S. Patent No. 5,997,553 (the '553 patent); and U.S. Patent No. 5,681,329 (the '329 patent).  Callicrate initiated suit against Wadsworth Manufacturing, Inc. (Wadsworth) on two of these patents in the United States District Court for the District of Montana, asserting that Wadsworth's EZE No. 2 and No. 3 castration tools (or use thereof) infringed claims 7, 11, 18, 19, 22, 25, 27, and 30 of the '329 patent and claims 11-13, 16, and 18 of the '553 patent.  After a jury trial on the merits, the jury found all of the asserted claims anticipated, obvious, and not infringed.  The district court denied Callicrate's Judgment as a Matter of Law (JMOL) motions on infringement and validity. Callicrate v. Wadsworth Mfg., CV 00-185-M-DWM (D. Mont. Aug. 5, 2004) (Post Trial

Order).  Because the district court improperly found that the '553 and '329 patents were not entitled to priority back to the '434 patent, this court reverses the jury verdict of anticipation and obviousness over an intervening patent.  Because substantial evidence does not support the jury verdict of no infringement, this court also reverses that verdict and remands for a trial on damages.

I.

Wadsworth and Callicrate are competitors in the manufacture and sale of castration tools.  These tools operate by tensively securing ligature material around an animal's scrotum, thereby preventing blood from flowing to the testicles.  With time, the ligated testicles atrophy and fall from the animal.  Wadsworth introduced its first "EZE" castration tool, the EZE No. 1, in 1986.  The EZE No. 1 is described in U.S. Patent No. 4,691,704 (the '704 patent).  Figure 1 depicts an embodiment of this invention:



The EZE No. 1 can be characterized as a "caulking gun-type" device because its trigger mechanism moves tightening rod 46 in a manner similar to a caulking gun.  See '704 patent, col. 5, ll. 13-17.  This caulking gun-type tightening mechanism also appears in the EZE No. 2 and EZE No. 3 devices, the accused products in this case.

After Wadsworth began selling the EZE No. 1, Callicrate identified a number of problems with the device and developed the improved device disclosed in Callicrate's '434 patent. For instance, Callicrate faulted the "caulking gun-type" tightening mechanism. As explained in the '434 patent:

> [T]he process of tightening the loop through successive pulls on the trigger mechanism [as disclosed in the '704 patent] is time consuming and the animal must therefore be restrained for a longer period of time. In addition, the tension which can be imparted to the band, and the tightness of the loop, are limited by the hand strength of the user. Moreover, relatively large frictional and abrasive forces are exerted on the band where the band is attached to the tightening rod, thereby increasing the likelihood of damage to the elastomeric material causing breakage before the desired tension is achieved. Additionally, due to the design of the ligature tool, an operator is limited in the extent a band can be tightened. Once an operator has fully retracted the tightening rod, the loop's tightness cannot be increased.

'434 patent, col. 1, l. 62-col. 2, l. 9. To overcome these problems, Callicrate invented a winding assembly 14 that performs essentially the same function as Wadsworth's caulking gun-type tightening mechanism but in a different manner. See '434 patent, col. 3, ll. 66-68. Figure 1 shows an embodiment of this invention:



The winding assembly 14 is the only tightening / pulling mechanism claimed in the '434 patent. Presumably, Callicrate did not assert the '434 patent against Wadsworth's EZE line of products because they do not include such an assembly.

Unlike the '434 patent, however, Callicrate's later '553 and '329 patents claim tools with a "means for pulling" that encompasses both caulking gun-type tightening mechanisms as well as winding assembly mechanisms. Callicrate v. Wadsworth Mfg., 217 F. Supp. 2d 1101, 1109 (D. Mont. 2002) (Claim Construction Order) (noting that Wadsworth conceded the claimed "pulling means" covers a winding spool mechanism and a caulking gun-type mechanism). Claims 11, 14 and 16 of the '553 patent are representative:

> 11. A tool for ligating a body part, comprising:
> an elongated tool body having a forward end and a rearward end, said rearward end having a handle and said forward end having a means for receiving elastomeric ligature material;
> means for pulling said ligature material towards said rearward end of said tool body, said means for pulling interconnected to said tool body; and
> a lever pivotally mounted on said tool body for deforming a grommet positioned in said means for receiving.
>
> . . . .
>
> 14. The tool of claim 11, wherein said means for pulling comprises a means for winding ligature material, said winding means adjustable to regulate the amount of force communicated by the rotation of said winding means to regulate the tension of said ligature material.
>
> . . . .
>
> 16. The tool as set forth in claim 11 wherein said means for pulling comprises a caulking gun-type device.

'553 patent, col. 24, ll. 11-21, 28-32, 38-39 (emphases added). Faced with this broader claim language in the '553 and '329 patents, Wadsworth admitted its EZE No. 2 and No. 3 castration tools (or use thereof), with their caulking gun-type tightening mechanism, satisfy every element of the asserted claims. Callicrate v. Wadsworth Mfg., CV-00-185-M-DWM, slip op. at 6-8 (D. Mont. Nov. 20, 2003) (Final Pre-Trial Order).

Despite this admission, Wadsworth argued at trial that its EZE No. 2 and No. 3 castration tools do not infringe the asserted apparatus claims because their components are not connected in the particular manner recited in the claims. Wadsworth further argued that use of its EZE No. 2 and No. 3 castration tools does not infringe the asserted method claims because a user does not perform all of the claimed steps. The jury ultimately agreed with Wadsworth, finding none of the asserted claims infringed by the sale or use of the EZE No. 2 or No. 3 castration tools.

Wadsworth also argued that the '553 and '329 patents are invalid as anticipated or obvious in view of Wadsworth's U.S. Patent No. 5,425,736 (the '736 patent) and the EZE No. 2 device disclosed therein. Wadsworth, however, filed the '736 patent after Callicrate's '434 patent, from which both the '329 and '553 patents claim priority. Thus, the '736 patent would not constitute prior art against the '329 and '553 patents if their claims of priority back to the '434 patent is valid. On their face, these priority claims seem valid because the '329 patent is a continuation in part of U.S. Patent No. 5,403,325, which is a continuation in part of the '434 patent. The '553 patent, in turn, is a divisional of U.S. Patent No. 5,483,095, which is a continuation in part of the '329 patent.

While admitting the relationship of the '553 and '329 patents to the '434 patent, Wadsworth argued that those patents are not entitled to priority back to the '434 patent because the '434 patent does not satisfy 35 U.S.C. § 112, ¶1 with respect to the caulking gun-type tightening mechanism. The district court agreed:

> Callicrate's failure to include the caulking gun mechanism anywhere in the application for the '434 patent other than the Background section, coupled with the disparaging nature of the remarks therein, demonstrates that the '434 patent does not disclose the use of the caulking gun. This conclusion

is further supported by the limiting definition of the winding means in claim 5 and the efforts to distinguish the caulking gun mechanism in the prosecution history. Though none of the cases cited by the parties is directly on point, under the facts the case law supports a finding that the Callicrate '329 and '553 patents cannot claim priority from the filing date of the Callicrate '434 patent with respect to the caulking gun mechanism. The . . . '736 patent is thus prior art to the '329 and '553 patents with respect to the caulking feature.

Callicrate v. Wadsworth Mfg., CV 00-185-M-DWM, slip op. at 13-14 (D. Mont. Dec. 3, 2003) (Summary Judgment Order). Based on this reasoning, the district court instructed the jury that the '736 patent is prior art to the '553 and '329 patents. The jury then found those patents anticipated by and obvious in view of the '736 patent.

## II.

This court reviews the grant or denial of a motion for JMOL "under the law of the regional circuit where the appeal from the district court normally would lie." Riverwood Int'l Corp. v. R.A. Jones & Co., 324 F.3d 1346, 1352 (Fed. Cir. 2003). The United States Court of Appeals for the Ninth Circuit reviews a district court's order granting JMOL without deference. See Vollrath Co. v. Sammi Corp., 9 F.3d 1455, 1460 (9th Cir. 1993). JMOL requires that "the evidence, construed in the light most favorable to the non-moving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's." Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir. 2002). The Ninth Circuit upholds any jury verdict supported by substantial evidence. Id. Substantial evidence is that relevant evidence that a reasonable mind would accept as adequate to support a conclusion. Gillette v. Delmore, 979 F.2d 1342, 1346 (9th Cir. 1992).

This court reviews the district court's grant or denial of a new trial under the law of the regional circuit. Mentor H/S, Inc. v. Med. Device Alliance, Inc., 244 F.3d 1365, 1374 (Fed. Cir. 2001). In the Ninth Circuit, "a grant of a new trial is reviewed for abuse

of discretion." Id. (citing United States v. 4.0 Acres of Land, 175 F.3d 1133, 1139 (9th Cir. 1999)). "Thus, [this court] may find that a district court abused its discretion in ordering a new trial if the jury's verdict is not against the clear weight of the evidence." Id. Because the district court has broad discretion in decisions having preclusive effects on the parties, our sister circuit also applies the abuse of discretion standard for those decisions. Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 607 (9th Cir. 1992).

III.

Turning first to the infringement issue, an infringement analysis is a two-step process: "First, the court determines the scope and meaning of the patent claims asserted . . . [and second,] the properly construed claims are compared to the allegedly infringing device." Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc) (citations omitted). "Step one, claim construction, is a question of law, that we review de novo. Step two, comparison of the claims to the accused device, is a question of fact, and requires a determination that every claim limitation or its equivalent be found in the accused device." N. Am. Container, Inc. v. Plastipak Packaging, Inc., 415 F.3d 1335, 1344 (Fed. Cir. 2005) (internal citations omitted).

As recently outlined in this court's Phillips decision, "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)). The claim terms "'are generally given their ordinary and customary meaning.'" Id. (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "The inquiry into how a person of ordinary skill in the

art understands a claim term provides an objective baseline from which to begin claim interpretation." Id. "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id. Thus, this court weighs the district court's claim interpretation by these standards.

In the '553 patent, the parties dispute two claim terms: (1) a lever for deforming a grommet; and (2) cutting means. Wadsworth's cross appeal additionally challenges the district court's construction of "pulling means" on the grounds that disclaimer of a caulking gun-type tightening mechanism during prosecution of the '434 patent should carry forward into the '329 and '553 patents (i.e., that "pulling means" cannot cover the disclaimed caulking gun-type tightening mechanism). However, during the district court's claim construction proceedings, Wadsworth did not challenge the district court's construction of this term and, in fact, conceded that the claimed "pulling means" covers the caulking gun-type tightening mechanism. Claim Construction Order, 217 F. Supp. 2d at 1109. This concession prevents Wadsworth from challenging the district court's interpretation of "pulling means" on appeal. As such, this court does not address whether the district court properly construed the term "pulling means." Claim 18 contains the two disputed terms in context:

> 18. A tool for ligating a body part, comprising:
> an elongated tool body having a forward end and a rearward end, said rearward end having a handle and said forward end having a means for receiving elastomeric ligature material;
> means for pulling said ligature material towards said rearward end of said tool body, said means for pulling interconnected to said tool body; and
> a lever pivotally mounted on said tool body for deforming a grommet positioned in said means for receiving; and
> cutting means for cutting elastomeric ligature material, said cutting means operatively attached to said tool.

'553 patent, col. 24, ll. 44-56 (emphases added).

"The district court's claim construction, a matter of law on appeal, receives no deference from this court." Nazomi Commc'ns, Inc. v. Arm Holdings, PLC, 403 F.3d 1364, 1367 (Fed. Cir. 2005) (citing Cybor Corp., 138 F.3d at 1454). For the following reasons, this court finds that the district court misconstrued both of the contested terms.

Lever For Deforming A Grommet

The district court construed this term as "a lever pivotally mounted to a ligation tool body such that the lever pivots about a fulcrum pin which is substantially perpendicular to the direction in which the preformed endless loop is pulled during the tightening operation." Claim Construction Order, 217 F. Supp. 2d at 1110. The district court reached this definition because the preferred embodiment in the specification speaks "of a 'lever pivotally mounted on the body of the tool.'" Id. The claim itself, however, does not include the specific language limiting the pivotally mounted "lever" to a particular embodiment.

The claim language itself suggests that a "lever pivotally mounted on said tool body for deforming a grommet" refers to a bar like structure (i.e., a lever) mounted on the tool body so that, when pivoted during operation, it is capable of deforming a grommet. The straightforward mechanical technology and understandable claim language give that meaning to this term. See Phillips, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.") (citing Brown v. 3M, 265 F.3d 1349, 1352 (Fed. Cir. 2001)).

The specification also indicates that the patent applicant did not limit "lever" to the one configuration identified by the district court. Rather, the '553 patent states:

> In a preferred embodiment, the tool includes a lever which is biased against the grommet located in a receptacle in the receiving end of the tool. The pressure exerted by the lever prevents the grommet from inadvertently being mispositioned prior to and during the operation of the tool. Furthermore, when sufficient tension is put on the endless loop and consequent pressure is applied to the body part to be severed, the lever is used to deform the grommet upon and/or around the endless loop to secure the loop around the animal's body part.

'553 patent, col. 4, ll. 32-41. This language does not require a fulcrum pin. Nor does this language require a fulcrum pin substantially perpendicular to the pulling direction of the endless loop. In sum, the claim language and the specification description are both broader than the district court's definition for "lever." While claims are indeed to be construed in light of the specification, as in the Phillips case itself, the district court in this case improperly imported limitations from the specification into the claims, thereby restricting the claims to coverage of a single embodiment. See Phillips, 415 F.3d at 1312 ("[I]f we once begin to include elements not mentioned in the claim, in order to limit such claim . . . we should never know where to stop.") (quoting McCarty v. Lehigh Valley R.R. Co., 160 U.S. 110, 116 (1895)); see also Eolas Tech. Inc. v. Microsoft Corp., 399 F.3d 1325, 1337 (Fed. Cir. 2005) (commenting that it is improper to limit claims to the preferred embodiment).

In sum, when properly construed in the context of the specification, this term means a bar like structure (i.e. a lever) that is mounted on the tool body so that, when pivoted during operation, it is capable of deforming a grommet.

Cutting Means

The district court determined that "cutting means" invoked means-plus-function treatment under 35 U.S.C. § 112, ¶ 6. Accordingly, the district court proceeded to identify the corresponding structure in the specification as a cutting device pivotally mounted on the tool. Claim Construction Order, 217 F. Supp. 2d at 1110. The district court defined this limitation as a "cutting mechanism which is pivotally mounted to a tool body and which will cut ligature material when pivoted into contact with the ligature material." Id. While § 112, ¶ 6 applies to this claim term, the structures disclosed in the '553 patent that perform the cutting function do not limit the "cutting means" as strictly as the district court's construction.

"This court has established a framework for determining whether the elements of a claim invoke means-plus-function treatment." Micro Chem., Inc. v. Great Plains Chem. Co., 194 F.3d 1250, 1257 (Fed. Cir. 1999) (citing Al-Site Corp. v. VSI Int'l, Inc., 174 F.3d 1308, 1314, 1318 (Fed. Cir. 1999)). "If the word 'means' appears in a claim element in association with a function, this court presumes that § 112, 6 applies." Id. "This presumption collapses, however, if the claim itself recites sufficient structure, material, or acts to perform the claimed function." Id.

In the present case, the district court correctly noted that the word "means" in the claim element raises the presumption that § 112, ¶ 6 applies. Claim Construction Order, 217 F. Supp. 2d at 1110. In addition, the district court correctly determined that the claim element includes a well delineated function - "cutting elastomeric ligature material" - without any recited structure for performing the function. Thus, the district court properly determined that § 112, ¶ 6 applies.

04-1597,-1598                                    11

"Application of § 112, 6 requires identification of the structure in the specification which performs the recited function." Micro Chem., 194 F.3d at 1257 (citing Rodime PLC v. Seagate Tech., Inc., 174 F.3d 1294, 1302 (Fed. Cir. 1999)). As noted above, the district court identified a pivotally mounted cutting mechanism as the disclosed structure that performs the cutting function. See '553 patent, col. 12, ll. 18-22; Claim Construction Order, 217 F. Supp. 2d at 1110. However, the '553 patent discloses other embodiments for performing the cutting function. Specifically, the '553 patent indicates that "[a]ny device for cutting the band 82 may be used[,]" including a cutting assembly 80 with a razor 88 *slidably* mounted within a housing 90 or *hand-held cutting tools* such as scissors and hand-held razors. See '553 patent, col. 11, l. 56-col. 12, l. 18. The district court's construction of this term does not account for these additional embodiments. Accounting for all structure in the specification corresponding to the claimed function, this term means pivotally mounted cutting mechanisms, slidably mounted cutting mechanisms, hand-held scissors, hand-held razors, and, of course, equivalents of these structures.

In addition to the "pulling means" limitation which this court does not address, the parties dispute the meaning of two terms in the '329 patent: (1) a lever for deforming a grommet; and (2) a preformed endless loop. This court has already construed the first term. In fact, the '553 patent has identical claim language and specification disclosures as the '329 with regard to this feature.

Preformed Endless Loop

The district court construed this term to mean "a loop of ligation material, regardless of size, having either a unitary, circular structure, or formed by joining the

ends of a linear length of ligation material." Claim Construction Order, 217 F. Supp. 2d at 1112. While mostly correct, this construction is slightly too broad because it reads out the "preformed" limitation and thus transforms the limitation into simply an "endless loop."

As described in the summary of the invention, a "pre-formed" loop is limited to those loops which are "formed prior to insertion of any band material into a ligation device[.]" '329 patent, col. 2, ll. 63-64. "[U]se of a pre-formed loop . . . eliminates the need for cumbersome lengths of ligation material used in conventional ligation operations and enables an operator to slip pre-formed loops over his/her arms or legs, thus facilitating easy access to such loops when performing multiple ligation procedures." '329 patent, col. 2, l. 63-col. 3, l. 2. Thus, Callicrate expressly defined "pre-formed" in the specification and highlighted the significance of this distinction over other loops. The district court's interpretation does not limit "preformed endless loops" to those formed before insertion into the castration tool. To that degree, the district court's interpretation does not fully reflect the claim language. See Playtex Prod., Inc. v. Procter & Gamble Co., 400 F.3d 901, 909-10 (Fed. Cir. 2005) (claim construction was flawed in part because it read "substantially flattened" as "flat," effectively ignoring the "substantially" qualifier in the claim).

The district court properly construed the remaining "endless loop" portion of this term. Accordingly, the word "endless" restricts this term to loops without an end. The '329 patent discloses at least two "endless" loop embodiments in Figures 13 and 14. As shown in Figure 13, one such endless loop comprises a circle of ligature material similar to a rubber band:



Fig. 13

Unlike the loop of Figure 13 which literally has no end, Figure 14 forms an "endless" loop by joining the ends of a straight length of ligature material to prevent separation of the two ends:



Fig. 14

'329 patent, col. 9, ll. 47-53. The loop shown in Fig. 14 is "endless" despite its two cut ends, because it has a substantially circular structure when tracing a path through the grommet 32 and forward loop 108. The specification describes both of the loops in Figures 13 and 14 as "endless." Thus, the specification as well supports the district court's construction which covers both embodiments. Addition of the "pre-formed" limitation simply limits the district court's construction to those "endless loops" formed before insertion into the castration tool.

The district court also properly rejected a number of arguments that would construe "preformed endless loop" more narrowly. For instance, the claim language

does not suggest that this term "is confined to a loop that is large enough to pass over the animal's scrotal pouch without stretching." Claim Construction Order, 217 F. Supp. 2d at 1111. This argument attempts to read great importance into comments made during prosecution of the '329 patent in traversing a rejection over U.S. Patent No. 2,125,404 (the '404 patent).

A careful reading of the prosecution history impeaches the argument that the applicant disclaimed and narrowed the "endless loop" limitation. In an Office Action dated March 26, 1996, the Examiner rejected various claims in the pending application as anticipated by the '404 patent. The '404 patent discloses a loop of elastomeric material attached to a ligation tool with a bow-like structure. Callicrate responded to this rejection: "The device described by [the '404 patent] is structurally distinct and considerably different than the claimed invention" and "functions in an entirely distinct way than the present invention . . . . [It] does not teach any method for securing the loop so that it maintains pressure around the body part of an animal." These comments highlight differences between the *castration tools*. These comments do not, however, distinguish the preformed endless loop in the claimed tool from loops in the '404 patent. Thus, this exchange did not disclaim subject matter within the scope of the "endless loop" limitation.

In addition to distinguishing the '404 patent by argument, Callicrate also amended the claims to require the use of a grommet in securing the loop once tightened about a body part. This amendment limits the amended claims to applications with a grommet (or some other "securing means" as recited in claim 14); this prosecution history does *not* place any restriction on the size of the loop. In fact, the record actually

suggests the exact opposite – a loop that is larger than the body part being ligated would need tightening and securing with some sort of securing means. Otherwise, the loop would apply no pressure to the ligated body part upon removal of the tool. Thus, the district court correctly refused to narrow the "endless loop" limitation.

The district court also correctly rejected an argument that a preformed endless loop must include a mechanical connection device (e.g., a grommet) attached thereto *prior to installation* in the castration tool. The only support for this argument was an amendment during prosecution to claims 1-6 and 8-10 of the '329 patent (which have not been asserted). The applicant amended these claims to traverse a prior art rejection over U.S. Patent No. 2,642,057 (the '057 patent) and U.S. Patent No. 5,459,905 (the '905 patent). Based on this amendment, Wadsworth argues that the preformed endless loop recited in claims 7, 11, 18, 19, 22, 25, 27, and 30 of the '329 patent should be narrowly construed as having a mechanical connection device (grommet) attached thereto before installation in the castration tool. This argument, however, overlooks that claims 1-6 and 8-10 claim an entirely different embodiment than the asserted claims. Thus, the amendments to these claims, as the district court properly observed, have nothing to do with the claims asserted by Callicrate.

To be specific, claims 1-6 and 8-10 claim an endless ligation loop. They do not claim a castration tool (or use thereof) as recited in the asserted claims. During prosecution, the '329 patent applicant amended claim 1 to specifically claim the loop embodiment shown in Figure 14. The amendment distinguished the Figure 14 embodiment from loops in the '057 and '905 patents. As amended, the claim recites a deformable grommet slidably attached to an endless band of ligature material to form a

loop by connecting the ends of the ligature with wire. This amendment was necessary because this focused claim lacked the other novel features of the castration tool or method of using said tool. Nonetheless the claims in the patent without the specific limitations of claim 1 are not necessarily limited to the Figure 14 embodiment.

Of course, this court interprets claim terms consistently throughout various claims of the same patent. See Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001). In this case as well, this court construes the term "endless loop" consistently throughout the '329 patent. Claims 1-6 and 8-10, however, contain additional limitations that limit those claims to the specific embodiment shown in Figure 14. In contrast, asserted claims 7, 11, 18, 19, 22, 25, 27 and 30 broadly claim castration tools that use endless loops such as those shown in Figure 13 as well as in Figure 14. In sum, the district court properly declined to limit the "endless loop" limitation.

Method claim 22 also includes language referring to the endless loop and a grommet. This language, however, does not limit this claim to preformed endless loops with a grommet attached before the loop enters the castration tool. Claim 22 recites:

22. A method for castrating an animal, comprising:

positioning a preformed endless loop of elastomeric ligature material into a receiving end of a tool, said endless loop having a forward end, a rearward end, and a grommet attached between said forward end and said rearword end; attaching said rearward end of said endless loop to a means for pulling said endless loop;
passing said forward end of said endless loop around the scrotum of an animal;
pulling said rearward end of said endless loop to cause said forward end of said endless loop to constrict around said scrotum of said animal; and
securing said forward end of said endless loop to maintain pressure around said scrotum of said animal.

'329 patent, col. 14, l. 65-col. 15, l. 12 (emphasis added). The highlighted language requires that the preformed endless loop contain a grommet. The claim language does not compel attachment of that grommet at any particular time. Rather, the language permits attachment of the grommet even after the preformed endless loop enters the tool body. To make this point clear, the specification notes a preference for pre-attached grommets, but specifically permits grommets attached later. See '329 patent, col. 3, ll. 2-4; col. 10, ll. 38-43. Thus, the district court correctly declined to limit claim 22 to preformed endless loops with a grommet attached prior to installation in the tool body.

This court next considers whether substantial evidence supports the jury verdict that Wadsworth does not infringe the asserted claims in the '329 and '553 patents. For both patents, the district court instructed the jury that "[a] device infringes a patent if it contains each and every element of a patent claim." The court's instructions also noted that Wadsworth admitted before trial that the EZE No. 2 and No. 3 devices (or use thereof) include all of the claim elements. Wadsworth does not dispute this admission on appeal, and has not challenged the district court's jury instructions. In light of these jury instructions and Wadsworth's admission, this court detects no basis for the jury's finding of non-infringement. Thus, the district court erred in denying JMOL to Callicrate on infringement of the asserted claims in both patents.

Moreover, this court sees no reason for a new trial on the infringement issues even though Wadsworth made its admissions based on the district court's erroneous claim construction. As to the '553 patent, the district court's claim construction error has no effect because Wadsworth's admissions were made under a narrower construction

than adopted by this court. Unlike the '553 patent, however, this court interpreted the claims of the '329 patent more narrowly. This court clarified that the "preformed endless loop" must be "preformed." The record, however, shows that this difference also does not warrant a new trial. The record does not show that this distinction excuses Wadsworth's products from infringement. See Seachange, Intern., Inc. v. C-COR, Inc., 413 F.3d 1361, 1379 (Fed. Cir. 2005) ("When we determine on appeal that a trial judge has misinterpreted a patent claim, we independently construe the claim to determine its correct meaning, and then determine if the facts presented at trial can support the judgment as a matter of law.") (citation omitted). Moreover, the claims of the '553 patent do not contain the "preformed" limitation at all. Thus, this slight change in the claim construction would not affect the outcome of the infringement issue. Accordingly, this court remands for a determination of infringement damages.

IV.

The jury also found the '329 and '553 patents anticipated by, and obvious in view of, Wadsworth's intervening '736 patent. The '329 and '553 patents, however, claim priority to the '434 patent, which was filed before the '736 patent. Thus, if the '736 is not prior art to the '329 and '553 patents, this court cannot sustain the jury's invalidity findings. The '736 patent can only qualify as prior art if the '329 and '553 patents cannot trace priority back to the '434 patent.

In the United States, a claim of priority to an earlier filed application(s) is governed by the provisions of 35 U.S.C. § 120. Section 120 provides, in part:

An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States . . . shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed

> before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application[.]

35 U.S.C. § 120 (effective Nov. 29, 2000) (emphasis added). As indicated in the highlighted language, a "patent may only claim priority to an earlier application if the earlier application fulfills the requirements of § 112, first paragraph. In turn, that paragraph requires, in part, that the application 'shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same.'" Chiron Corp. v. Genentech, Inc., 363 F.3d 1247, 1253 (Fed. Cir. 2004) (quoting 35 U.S.C. § 112, ¶ 1). Based on these statutory requirements, the district court proceeded to determine whether the '434 patent contains an adequate written description and enabling disclosure for the caulking gun-type mechanism. Ultimately the district court answered this question in the negative based on its impression that the '434 patent did not contain adequate "disclosure" and "support" of the caulking gun-type tightening mechanism, though its opinion fails to mention either the written description requirement or the enablement requirement. Summary Judgment Order, slip op. at 6-14. Because the district court's analysis in the opinion, however, suggests its inquiry was focused on the enablement requirement and because the parties have not presented any arguments specific to the written description requirement, this court limits its inquiry to whether or not the enablement requirement was satisfied in this case.

This court reviews enablement as a question of law based on underlying facts. In re Wands, 858 F.2d 731, 735 (Fed. Cir. 1988). "This court reviews the underlying factual findings for clear error and the legal component of enablement without

deference." Chiron, 363 F.3d at 1253 (citing Plant Genetic Sys. N.V. v. DeKalb Genetics Corp., 315 F.3d 1335, 1339 (Fed. Cir. 2003)).

In the present case, the district court determined that the '434 patent did not contain adequate "disclosure" or "support" for the use of a caulking gun-type tightening mechanism for three reasons: (1) the only disclosure of the caulking gun-type tightening mechanism is in the background section; (2) the background section contains disparaging remarks about this mechanism; and (3) Callicrate distinguished his winding assembly mechanism from the caulking gun-type tightening mechanism during prosecution. See Summary Judgment Order, slip op. at 13-14. These three reasons, even in combination, do not support the district court's conclusion of no enablement.

First, a patent specification may sufficiently enable a feature under § 112, ¶ 1, even if only the background section provides the enabling disclosure. See Micro Chem., 194 F.3d at 1259-60 (finding that, under a §112, ¶ 6 analysis, the claims encompass a weigh dump method despite the fact that the only disclosure of this method was in the background section); United States v. Telectronics, Inc., 857 F.2d 778, 785 (Fed. Cir. 1988) ("The test of enablement is whether one reasonably skilled in the art could make or use the invention from disclosures in the patent coupled with information known in the art without undue experimentation.") (emphasis added). Indeed, if disclosure solely in the background section were insufficient to satisfy the enablement requirement of § 112, then the Examiner would likely have rejected claim 16 during prosecution of the '553 patent for lack of enablement because the only disclosure of a caulking gun-type mechanism being used in a castration tool embodiment in the '553 patent appears in the background section. See '553 patent, col.

2, ll. 1-22 (background section describing caulking gun-type mechanism in depth), col. 3, ll. 38-43 (summary section disclosing pre-formed loop embodiment, which may be used with prior art devices such as a caulking gun-type mechanism), col. 15, ll. 35-39 (detailed description section disclosing crimping embodiment in comparison to '704 patent's elongated crimping rod); Manual of Patent Examining Procedure, § 2164.04 at 2100-183 (8th Ed. Rev. 1, Feb. 2003) ("[T]he examiner has the initial burden to establish a reasonable basis to question the enablement provided for the claimed invention." "[I]f an enablement rejection is appropriate, the first Office action on the merits should present the best case with all the relevant reasons, issues, and evidence so that all such rejections can be withdrawn if applicant provides appropriate convincing arguments and/or evidence in rebuttal.").

Moreover, contrary to the district court's opinion, the background section's discussion of problems with the caulking gun-type tightening mechanism does not mean that one of ordinary skill in the art would not, after reading this discussion, know how to make and use this feature. Indeed this court has stated that disparaging remarks in a background section or remarks characterizing the prior art as less effective do not remove those disclosures as enabling references. See Micro Chem., 194 F.3d at 1260. Again, if these comments in the background failed to provide an enabling disclosure, the Examiner would likely have rejected claim 16 during prosecution of the '553 patent because these "disparaging" remarks appear in that patent as well. See '553 patent, col. 2, ll. 1-22. Here, the '434, '329 and '553 patents all identify problems with the caulking gun-type tightening mechanism, but by no means indicate that this mechanism

cannot perform the tightening / pulling function. Accordingly, the district court's reliance on these comments was misplaced.

Finally, the '434 patent's prosecution history is no more dispositive than the noted comments in the background section. During prosecution, the Examiner rejected the pending claims over Wadsworth's '704 patent, with its caulking gun-type tightening mechanism, in view of U.S. Patent No. 2,487,425 (the '425 patent). Callicrate responded by challenging the motivation to combine these references because the '425 patent was non-analogous art. Callicrate further argued that, even when combined, the references do not teach a process that could "achieve quick and tight application of a ligature band to a body part in accordance with claim 1." Essentially, Callicrate pointed out the very same problems with these devices that already appeared in the background section. At no time, however, did Callicrate have any reason to explain how or why the caulking gun-type mechanism could not be used as a means for pulling in the '434 patent because the pending application did not claim that technology.

Thus, the district court did not articulate any sound reasons that the '434 patent does not enable the caulking gun-type mechanism. To the contrary, the '434 patent specifically referred to that prior art technology. Without any basis in this record to determine that one of skill in the art could not make and use a caulking gun-type tool with this disclosure, this court cannot sustain the district court's nonenablement conclusion. Thus, the '329 and '553 patents may claim priority based on their relationship to the '434 patent. The '736 patent is, therefore, not prior art. Because the jury invalidated both the '553 and '329 patents over the '736 patent as prior art, this verdict cannot stand. Finally, because this court finds in favor of Callicrate on this issue,

the court need not address Callicrate's arguments in support of its motion for a new trial on invalidity.

Wadsworth also argues that the EZE No. 2 device itself is prior art to the '553 and '329 patents. However, the earliest date in the record regarding the EZE No. 2 device is an alleged November 1993 reduction to practice. Because November 1993 is after the '434 patent's December 16, 1991 filing date, and the record shows no inventive activity before this date, this court also rejects this argument.

V.

In conclusion, because substantial evidence does not support the jury verdicts of non-infringement and invalidity of the '553 and '329 patents, this court reverses those verdicts. The case is remanded to the district court for a determination of damages.

COSTS

Each party shall bear its own costs.

<u>REVERSED and REMANDED</u>